

# NUMBER 13-10-00100-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF E.S. AND A.G., CHILDREN

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Yañez and Rodriguez
### Memorandum Opinion by Justice Yañez

Appellant, V.S., appeals the termination of her parental rights to her two children,

E.S. and A.G.[1] By three issues, V.S. contends that: (1) the evidence is legally and

factually insufficient to support the trial court's finding that she violated two statutory

---

[1] *See* TEX. R. APP. P. 9.8(b)(2) (providing that in a parental-rights termination case, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member").

grounds for termination; and (2) the evidence is legally insufficient to support a finding that termination was in the best interest of the children. We affirm.[2]

## I.    BACKGROUND

V.S. took E.S., a thirteen-month-old child, to the emergency room with second-degree burns to her head and face on January 1, 2009. That day, V.S. also gave birth to A.G. On January 13, 2009, the trial court entered an emergency order naming the Texas Department of Family and Protective Services (the "Department") temporary sole managing conservator of the children. E.S. and A.G. were removed and placed in foster care.

On February 12, 2009, pursuant to section 263.106 of the family code, the trial court ordered V.S. to comply with each requirement as set out in the Department's service plan.[3] Under the provisions of the plan, V.S was required to complete the following tasks: (1) attend anger management class; (2) attend all of her visitations with her children; (3) attend parenting class; (4) obtain stable and safe housing; (5) not to participate in any criminal activity; (6) obtain an individual psychological evaluation; (7) obtain employment;[4] and (8) demonstrate that she was capable of providing a safe and stable home environment for the children.

On January 20, 2010, Jessica Rombs, Nancy Sanders Harper, M.D., Porfirio Gutierrez, V.S., the children's foster father,[5] and Rosalinda Torres testified at a bench

---

[2] The trial court also terminated the children's father's parental rights; however, the father, A.U.G. does not appeal the trial court's order terminating his parental rights to E.S. and A.G.

[3] *See* TEX. FAM. CODE ANN. § 263.106 (Vernon 2008).

[4] Specifically, the service plan required that either A.U.G., V.S., or both obtain employment.

[5] The children's foster father.

trial. After hearing the evidence, the trial court found by clear and convincing evidence that V.S. had violated sections 161.001(1)(N) and (O) of the family code and that termination of the parent-child relationship was in the children's best interest.[6] The trial court ordered the termination of V.S.'s parental rights to E.S. and A.G. This appeal ensued.

## II. STANDARD OF REVIEW

Before terminating the parent-child relationship, the trial court must find that the parent committed an act prohibited by section 161.001(1) of the Texas Family Code and that termination is in the child's best interest.[7] Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.[8] Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence.[9] This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings.[10] It is defined as the

---

[6] *See* TEX. FAM. CODE ANN. § 161.001(1)(N), (O) (Vernon Supp. 2010).

[7] TEX. FAM. CODE ANN. § 161.001; *id.* § 153.002 (Vernon 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[8] *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.–Corpus Christi 2006, no pet.).

[9] *In re J.L.*, 163 S.W.3d at 84; *In re D.S.P.*, 210 S.W.3d at 778.

[10] *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.–Fort Worth 2006 pet. denied); *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 57 (Tex. App.–Corpus Christi 2003, no pet.).

"measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[11]

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'"[12] We must assume that the trier of fact, the trial court in this case, resolved disputed facts in favor of its finding if it was reasonable to do so.[13] "A corollary to this requirement is that a court should disregard all evidence that a reasonable fact[-]finder could have disbelieved or found to have been incredible."[14] However, "[d]isregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence."[15]

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child."[16] Under this standard, we consider whether the

> disputed evidence is such that a reasonable fact[-]finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could

---

[11] TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

[12] *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.–Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d at 28).

4

not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.[17]

### III.    THE EVIDENCE

Rombs, a social worker with Driscoll Children's Hospital, testified that due to E.S.'s severe burns, she completed a psychological assessment of V.S. on January 1, 2009.[18]  The purpose of the psychological assessment was to rule out or to determine if there were any "concerns" of abuse or neglect.  V.S. told Rombs that E.S. was in her care when she was injured and that A.U.G. wished to remain anonymous.[19]

According to Rombs, V.S. claimed that E.S. was standing in the bathtub when E.S. turned on the hot water and burned herself.  Rombs was concerned that V.S.'s explanation of what happened was inconsistent with E.S.'s injuries because all of the injuries were to the "upper extremities;" and based on V.S.'s story, "there should have been burns to the feet, splashes to the leg or splashes to the bottom part of her torso, which there were not any injuries of that sort."  Rombs was also concerned that V.S. did not have the ability to keep E.S. safe because E.S. "lacked" medical care.  According to Rombs, V.S. told her that the incident happened between 2:00 and 3:00 a.m. on December 31, 2008—twenty hours before V.S. brought E.S. to the emergency room.  V.S. informed Rombs that she did not seek immediate medical attention because she did not notice any redness or injury to E.S.[20]

---

[17] *In re J.F.C.*, 96 S.W.3d at 266.

[18] On cross-examination, Rombs stated that V.S. brought E.S. to the emergency room after midnight, and she interviewed V.S. at approximately 2:00 a.m.  V.S. then gave birth to A.G.

[19] On cross-examination, Rombs stated that V.S. said that she and E.S.'s father "were no longer together but they still talked."  Rombs acquired A.U.G.'s information from the police department.

[20] We note that V.S. is not a nurse, physician, or trained to treat E.S.'s injuries.

5

Although Rombs did not examine E.S., she did review photographs of E.S.'s injuries. Rombs stated that E.S. had severe burns to her face and scalp, E.S.'s hair was matted to her scalp, and her eyes were swollen shut. Rombs testified that she believed a reasonable person would have known that E.S. was in severe need of medical attention. After conducting her assessment, and because of her concerns that V.S.'s story was inconsistent with E.S.'s injuries, Rombs contacted the Department and the Corpus Christi Police Department.[21]

On cross-examination, Rombs stated that she conferred with Dr. Harper, Sandra Prado, the "State nurse," Dr. O'Daniel, and Julie, the emergency room nurse.[22] Rombs believed that the consensus opinion was that E.S. had been submerged in hot water. Rombs testified that in addition to the burns, E.S. had a bite mark on her "bottom."

Dr. Harper is a child abuse pediatrician and the director of the "CARE Team" at Driscoll Children's Hospital; her duties include managing the CARE Team and providing consultations to patients when there are concerns of neglect, failure to thrive, and physical abuse such as fractures, burns, brain injuries, sexual abuse, sexual assault, and medical child abuse. Dr. Harper explained that consultations are detailed and involve reviewing the patient's history, physical examination, medical history, medical records, tests that have been performed, and the child's developmental abilities; speaking with physicians that have cared for the child; and compiling a comprehensive evaluation.

---

[21] On cross-examination, Rombs testified that E.S. was transferred to a burn unit in San Antonio.

[22] The record does not contain Julie's last name or Dr. O'Daniel's first name.

Dr. Harper stated that she was asked to consult on E.S.'s case. Dr. Harper testified that E.S. had extensive second-degree burns that covered eighteen percent of her body, including her entire face, the back of her head, and the back of her neck onto her shoulder. E.S. also had some "minimal first-degree appearing burn" going down her back. E.S. also had an adult human bite mark on her "butt." According to Dr. Harper, E.S. was immediately transferred to the burn unit in San Antonio because when a child suffers burns of over ten percent of his or her body, the general rule is the child is transferred to a burn unit.

Dr. Harper testified that she was concerned about a few things after she reviewed the hospital records. Dr. Harper stated that she was concerned that E.S. sustained the injury twenty-one to twenty-two hours before V.S. brought E.S. to the hospital. Dr. Harper was also concerned that E.S's heart rate was 208 when she arrived at the hospital. Dr. Harper explained that a heart rate of 208 is abnormal and that such a heart rate indicates that the child needs a quick assessment and is potentially dehydrated, or going into shock. Dr. Harper was also concerned because:

> . . . when you looked at the exam on her body she had very significant second-degree burns that covered, you know, her entire face, sparing the chin, the lower lip, sparing just probably a little bit of the bottom of her earlobes. It extended all the way through her scalp, the back of her head. It was very clearly demarcated, meaning she had very clear marks where the second-degree burn ended, along her jaw, and along the back of the hairline.
>
>     . . . .
>
> She also had, of course, some areas of second-degree burn on the back of her neck if I can remember. The first-degree area, though, was interesting it was on her back but was kind of diffused. It wasn't what we expected with water flowing across a body. So, when water flows across the body that's hot enough to burn, it makes these sort of flow pyramids and flow triangles, and that was not present.

7

So just even looking at her injuries I was very concerned this was not sort of an accidental injury as had been reported to the ER staff.

The trial court then admitted photographs taken at the hospital on January 1, 2009, at the hospital of E.S.'s injuries. Dr. Harper described the injuries as follows:

First, of course, it's important to point out that she was just given morphine in case people are wondering, so she's sleeping after she had been given some pain medication.

Her eyes, however, were swollen shut to the degree that the doctors actually couldn't open them and examine them in the emergency room. And they actually had some difficulties when the ophthalmologist examined them in San Antonio.

If you look at her face here you can see what I was referencing earlier. These are second-degree burns. And the way that you can tell the difference is a first-degree burn appears like a sunburn so the skin appears pink.

When you start developing a second-degree burn you get blistering and you get the sloughing or peeling off of that superficial layer of skin. So a second-degree burn burns the skin and starts going down into the sort of the fatty layer. Depending on how deep it is, it damages things like sweat glands and hair follicles along the way.

. . . .

This is a second-degree burn. It spares her lower lip, meaning, it's not involving her lower lip and her chin but it covers the rest of her face, her eyelids, eyebrows, forehead, up into her hairline. You can see her right ear here. It extends across her right ear, sparing her earlobe at the bottom and sparing her neck.

Dr. Harper stated that E.S. did not have any burns on her arms, chest, legs, and fingers, which concerned her because "in general when children accidently turn on hot water and burn themselves accidentally, generally, there are things such as splash marks or areas involving arms and legs from either the water coming out of the faucet or their hands turning faucets on. . . ." Dr. Harper also observed that E.S.'s injuries

8

showed that she attempted to protect herself by bringing her left ear down to her shoulder.

Dr. Harper stated that a hot tub is usually set to 104 to 108 degrees and infant bathtubs are usually set to 99-100 degrees. According to Dr. Harper, a person senses pain from heat at around 108-112 degrees; therefore, if a water heater is set at 120 degrees, a child would be feeling the pain and would be crying and screaming. Dr. Harper opined that for a child to sustain the type of burns E.S. suffered, it would have taken ten minutes of continuous exposure to water heated to 120 degrees. However, "[a]s the temperature goes up, the burn severity increases, so you can more likely get a worse burn and the time that it takes for it to occur shortens." Dr. Harper stated that in water heated to 130 degrees, it would take only a minute for someone to sustain second-degree burns at 140 degrees, it would take approximately half a minute or seconds to get a second degree burn, and in 150-degree water, a third-degree burn would be almost instantaneous. Dr. Harper testified that she would not expect burns such as those suffered by E.S. to have been caused by water heated to 120 degrees because V.S. stated she heard E.S. scream and she had enough time to then rescue E.S. from the hot water.[23] In that case, Dr. Harper would have expected first-degree burns.

When asked what conclusions she drew from the fact that the burns to E.S.'s back were not as severe as those to her head, Dr. Harper replied:

Generally, we look for—when children have an accidental, you know, burns, from water we look for flow patterns, you know, going across the

_____

[23] This is the same explanation given by A.U.G. after he admitted that E.S. was in his care when she was injured.

body. And you might expect to see flow down the back or flow on the chest.

But then you would usually see where if it [sic] hot enough to leave such a clear line on the back of her neck, that second-degree burn should continue down her back if it was flowing from the water flowing across her head. So it ended at the back of her neck and then there was no flow triangle.

So generally when we look at burns, we look at the pattern and generally we have an accidental flow burn across the back, kind of gives you sort of a very sort of discrete outline. It's symmetric, it's—the depth of it is the same and it shows you where the burn kind of just sort of flowed down the back.

In this case . . . it's just more diffused. My concern was, was there clothing, was there a towel, did hot water drip down into a towel where there would have been some protection from the heat and give you more of a diffused pattern on the back.

Dr. Harper stated that E.S. suffered from pain and the development of dehydration and shock, which were life-threatening and could have been easily reversed. According to Dr. Harper, medication such as Children's Tylenol probably would not have effectively treated E.S.'s pain.

According to Dr. Harper, V.S. reported that while E.S. was in her care, she left E.S. in an empty bath tub to get a towel; she then heard E.S. scream, came back into the room, and found E.S. standing up while the water was running. Dr. Harper stated that the explanation given by V.S. did not explain the injuries sustained by E.S. Dr. Harper opined that if E.S. had been sitting down or standing up in water that was hot enough to cause the types of burns she sustained, there would have been splash marks on the hands, feet, and other areas of the body. Therefore, because there were no splash marks on E.S. or burns to her feet and hands, "the pattern didn't fit her getting a

10

flow burn that she caused herself." Dr. Harper stated that she would not expect injuries to be limited to the face, neck, and back if E.S. had turned the faucet on herself.

When asked if she had an opinion on the manner in which a child would receive burns such as those sustained by E.S., Dr. Harper responded:

> My biggest concern looking at the pattern and how there was the sparing just on her chin and how her ear was tucked against her shoulder, this is what we see in those rare cases when a child is actually immersed head first into scalding water. With her arms being spared, perhaps there was a towel wrapped around her upper body that had prevented an arm or hand from having contact, but it looks as though her head and her face were just dipped into scalding water.

On cross-examination, Dr. Harper stated:

> My concern is that the head was immersed. Whether it was immersed with the running water, with the assistance of a caregiver, adult, or immersed into standing—whether, sink, bucket, I don't know. But this was what we see when somebody's had their head immersed, not from just turning on the water and accidently getting underneath it.

When asked, "Would it be like somebody grabbing the child and physically putting the child's head into water," Dr. Harper replied, "That is my concern, yes, sir."

E.S. also had superficial burns across her corneas and underneath her eyelids, meaning that her eyes were either open or not completely sealed shut when she was in the scalding water. Dr. Harper concluded that E.S.'s injuries were non-accidental. On cross-examination, Dr. Harper stated that in the medical records from San Antonio, it was documented that E.S.'s injuries were "'suspicious of NAT,' which stands for non accidental trauma." Dr. Harper stated that she was extremely concerned that "whoever caused these injuries [to E.S.] is a real risk to her." On cross-examination, Dr. Harper testified that the type of injuries E.S. suffered were "graphic and disturbing" and were not the type "that a parent would have said, oh, this is okay, I can just watch it."

11

Gutierrez, a special investigator with the Department, testified that he was assigned to the case because of "the seriousness of the injuries that were inflicted on [E.S.]." According to Gutierrez, the Department removed E.S. and A.G. because there were inconsistencies in V.S's and A.U.G.'s stories to the Department regarding how E.S. was injured. Gutierrez stated that the Department determined that E.S. and A.U.G. were lying and that the parents were not capable of protecting the children because the injuries were so severe. Gutierrez testified that A.U.G. had initially said that the child had been injured while in V.S.'s care; however, once the police department became involved, "the stories changed" and it was determined that E.S. was with A.U.G. when she was injured. A.U.G. stated that he left E.S. in the bath tub to get a towel and that E.S. turned on the hot water and that she scalded herself. On cross-examination, Gutierrez clarified that V.S. also claimed that E.S. was in her care when she was injured but later admitted that E.S. had been in A.U.G.'s care.

Gutierrez was assigned to go to A.U.G.'s home to take pictures of the bathroom for the investigation. Those pictures were given to Dr. Harper. Gutierrez stated that he did not "feel safe" at A.U.G.'s house because people that Gutierrez recognized as being gang members arrived at the house.[24] According to Gutierrez, A.U.G. had a lengthy criminal history, including convictions for possession of marihuana, possession or use of an unlawful criminal instrument, burglary of a vehicle, assault causing bodily injury,

---

[24] Before working for the Department, Gutierrez worked in law enforcement.

evading arrest, and resisting arrest.[25]  Gutierrez stated that A.U.G. had been indicted by

a grand jury for the offense of injury to a child.[26]

On cross-examination, Gutierrez read his summary of A.U.G.'s version of how

E.S. was injured.  Gutierrez stated:

> [A.U.G.] said that on December 31 he took [E.S.] a bath around 3:00 or
> 4:00 in the morning but—and this is in quotes, did not really know, end
> quote, the time.  He said that after the bath he left [E.S.] in the tub but said
> that there was no water in the tub and said that he turned the water off.
>
> [A.U.G.] said that he went to a closet to get [E.S.] a shirt to dry her off
> because there were no towels.  He said that he heard [E.S.] scream and
> went to the tub to find [E.S.] standing in the tub crying.
>
> [A.U.G.] said that the hot water was running and he—and this is in quotes,
> he knew that she got burned, end quote.  He said he got her out of the tub
> and said she was shaking—and that's in quotes, when he dried her off but
> said that she was not crying anymore.
>
> [A.U.G.] said that he turned off the hot water and did not get burned but
> he, quote, saw the steam, end quote coming from the faucet . . . .
>
>      . . . .
>
> [A.U.G.] said he saw that [E.S.] was red—and that's in quotes . . . .

According to Gutierrez, A.U.G. stated that he then gave E.S. some Children's

Tylenol, and the redness went away; E.S. felt better because she was "running around."

A.U.G. stated that he put E.S. to sleep, and when he woke up at around 4:00 p.m., he

noticed that E.S.'s face was swollen.  At approximately 11:00 p.m., A.U.G. and his

grandmother picked up V.S. and took E.S. to the emergency room.  After A.U.G.

allegedly told V.S. that he "had warrants," V.S. told A.U.G. that she would say that E.S.

---

[25] A.U.G.'s criminal record was admitted into evidence.  The record shows that A.U.G. pleaded "guilty" or "nolo contendere" to each offense.

[26] The trial court admitted a copy of the indictment into evidence.

13

was with her when she was burned. Gutierrez stated that A.U.G. said that he left the hospital at approximately 4:00 a.m. and went home and got high because he was upset. A.U.G. claimed that E.S. was burned accidently and that he did not cause the injury. When shown pictures of E.S.'s injuries, A.U.G. said that she did not have any blisters the previous night. However, A.U.G. did admit that E.S.'s injuries "got bad" because he waited to get her medical attention. A.U.G. stated that he had not noticed the bruise on E.S.'s bottom and that it was probably caused by a young child who visits his home.

V.S. testified that she is E.S.'s and A.G.'s biological mother. V.S. stated that she did not feel safe at A.U.G.'s house, unless A.U.G. was present. However, V.S. admitted that on December 20, 2009, she moved out of A.U.G.'s house and left E.S. to live alone with A.U.G. until the day she was burned. V.S. explained that A.U.G. was her "only babysitter." V.S. acknowledged that A.U.G. was "still on drugs" when she left E.S. in his care. On cross-examination, V.S. stated that when A.U.G. called her about E.S.'s injuries, she had not seen E.S. since Christmas Day—approximately ten days earlier.

V.S. stated that A.U.G. told her that he left E.S. in the bath tub with the water off, then he heard E.S. scream. When A.U.G. returned, the hot water was on and E.S. had been burned. V.S. testified that after seeing the pictures and hearing A.U.G.'s story several times, she no longer believed A.U.G.'s story about how E.S. was burned. V.S. claimed that A.U.G. told her that he waited to take E.S. to the hospital because "he was scared and . . . he didn't know what to do." On cross-examination, V.S. testified that she was in labor with A.G. when A.U.G. called her about E.S.'s injuries.

According to V.S., on January 2, 2009, prior to the children's removal and placement in foster care, she agreed to place E.S. and A.G. with her aunt and her

14

uncle.  The children's aunt and uncle cared for the children for approximately two weeks.  V.S. admitted that during those two weeks, she did not visit A.G., who was a newborn, or E.S., who was severely injured.  V.S. stated that she did not have transportation to make the visitation with her children and that she did not understand the bus schedules.  V.S. stated that the children's aunt and uncle volunteered to give her a ride, but claimed that they refused to go to A.U.G.'s house, where V.S. was living, because "CPS said that [A.U.G.] wasn't allowed—that [the children's aunt and uncle] weren't allowed over there."

V.S. admitted that she lied when she told Rombs that when E.S. was injured, E.S. was in her care.  When asked why she had lied, V.S. replied:

> Because I didn't think CPS was going to get involved and I thought it was just take her to the hospital and see what they could do for her, if they could make her better, you know give her medicine to make it go away, and that was it.  I didn't think CPS was going to come in, the cops, all of this.  I didn't think it was going to happen.

The Department then asked V.S. why CPS's involvement made a difference; V.S. said, "I don't know, ma'am."  V.S. insisted that she did tell hospital staff what had happened to E.S., but that she had simply changed one detail—who was caring for E.S. when she was injured.  The Department asked why she did not say that the incident occurred at A.U.G.'s house; V.S. replied, "I don't know, ma'am."

V.S. admitted that when she was interviewed by CPS on January 2, 2009, she continued to claim that E.S. was in her care when she was injured.  V.S. stated that she did not know why she continued to lie to CPS but claimed that she was not "covering up" for A.U.G. or protecting him.  V.S. agreed that she was willing to take responsibility for what happened to E.S. rather than to "implicate" A.U.G.  V.S. agreed that she told a

15

detective that she lied about who was caring for E.S. because she "felt bad" and she wanted to "take the blame." V.S. testified that on January 5, 2009, she told the detective that E.S. was in "Ms. Jonas Garcia['s]" care when she was burned.

After giving birth to A.G., V.S. moved back into A.U.G.'s house, and according to V.S., A.U.G. physically abused her. On one occasion, A.U.G. hit V.S. with his fist on the side of her face, causing V.S. to sustain a black, swollen eye. V.S. claimed that she moved in with A.U.G. because there was nowhere else for her to go. V.S. acknowledged that at the time of the trial, she was four months pregnant with A.U.G.'s child—their third child together.

V.S. testified that she pleaded "guilty" to "hindering apprehension" of A.U.G. on November 30, 2009, and confirmed that she was on probation for that offense at the time of trial. On cross-examination, V.S. explained that on August 12, 2009, the police attempted to arrest A.U.G. for injuring E.S., and although V.S. knew that A.U.G. was in the house, she told the police that she did not know A.U.G.'s whereabouts and that she had not seen him. The police found A.U.G. "hiding inside the couch." V.S. admitted that she was protecting A.U.G. from being arrested that day.

According to V.S., A.U.G. began beating her again, and she wanted to remove herself from that situation. Therefore, V.S. testified that two months prior to the trial, after she was released from jail, she moved out of A.U.G.'s house and into A.U.G.'s mother's house. V.S. stated, "And from his mom's I went to go visit [A.U.G.'s] Aunt Ruby and I ended up staying the night there. [A.U.G.] went there . . . early Monday morning to go pick me up whether I wanted to leave or not, and beat me and kept me there for like a week, you know. . . ." V.S. left A.U.G.'s house again on approximately

16

November 17, 2009.[27] V.S. stated that she had not contacted or spoken with A.U.G. since that day.

V.S. acknowledged that the Department's caseworker had clearly explained to her the service plan and the steps she needed to take in order to get the children back and that she had been present for all of the court hearings except on one occasion. V.S. stated that she had heard the trial court and her caseworkers discuss the requirements of the service plan and what she needed to accomplish before regaining custody of the children. V.S. testified that after a year, she had not completed the parenting and anger management classes. V.S. claimed, however, that she had almost completed the classes.[28] V.S. stated that she had not completed the psychological examination but claimed she was unable to get an appointment with the doctor because her paperwork was never forwarded to him. V.S. did not recall when she attempted to set up an appointment with the doctor but believed that she had contacted his office approximately one month before the trial.

V.S. acknowledged that she had missed approximately half of her visits with E.S. and A.G. during the past year.[29] V.S. admitted that she did not visit the children at all during the months of June 2009 through August 2009. V.S.'s visitation was cancelled in July because she was not attending, and the visitation had to be reinstated in August. V.S. stated that she was not consistent with her visitation. V.S. explained that she

---

[27] The trial was held on January 20, 2010. Therefore, at the time of the trial, V.S. had not lived with A.U.G. for approximately two months.

[28] On cross-examination, V.S. said that she started attending parenting and anger management classes one month before the trial. V.S. stated that she attended six parenting classes and five anger management classes.

[29] On cross-examination, V.S. stated that she did not send any cards or letters to the children and that she did not get them any Christmas presents because she did not have any money.

17

missed her visits because she had overslept.[30]  V.S. stated that she understood that her children had waited for her and that she had failed to attend those visits.  On cross-examination, V.S. testified that since November 2009, she had attended the visitations with her children.[31]

V.S. acknowledged that she did not have a job and that she had not been seeking employment until she left A.U.G.'s house in November 2009—two months prior to the trial.  V.S. admitted that she had known for twelve months that she was required to get a job so that the children would be returned to her.  On cross-examination, V.S. stated that A.U.G. did not have a job and that to her knowledge, the only job that he had was when he was sixteen years old.[32]

V.S. claimed that she is on a waiting list for housing and that she would be getting an apartment in approximately twelve to eighteen months.  On cross-examination, V.S. stated that if the children were returned to her, she planned on going back to school.[33]  When asked what her plans were if the children were returned, V.S. said:

> Doing anything I can.  I'd get a job to support them.  Again, with my apartment that I'd get, I'd get anything, you know to keep them safe.  You know the little plastic things that go in the plugs, those gates that you put in the stairs so, you know, they don't climb up or down or so they don't hurt themselves, tub stoppers.  I'd do anything and everything to better myself for them.  I'd go back to school, settle on what I want to do with my life as career-wise. . . .

---

[30] On cross-examination, V.S. clarified that the visits were scheduled for 5:00 or 6:00 p.m.  V.S. explained that she took naps during the day and that is why she overslept.

[31] V.S. stated that she missed two visits due to illness; however, V.S. admitted that on one occasion, she did not notify the caseworker that she was going to miss the visit.

[32] At the time of the trial, A.U.G. was twenty-one.

[33] V.S. testified that she quit school when she was eighteen and in ninth grade.

18

V.S. stated that she would request supervised visits if A.U.G. wanted to see the children.

V.S. stated that during the past year, she had resided with A.U.G. and denied telling her caseworker that she was living with her mother. V.S. claimed that she told her caseworker, Torres, that she was living with a friend, Connie Gallardo. The Department then asked, "But you never told [Torres] that you were residing in your mother's home," and V.S. replied, "Staying with my mom, but not in my mom's home. My mom doesn't have a home of her own." The following exchange then occurred:

[The Department]: So [your mother] also lives with this Connie?

[V.S.]: No, she doesn't, not anymore.

[The Department]: Where were you living, [V.S.], when you were in the same home with your mother. Whose home was that?

[V.S.]: That was when I was living in the same home as my mother I lived there a few times. The first time when I left him, when all of this happened with [E.S.], was in my mom's own home.

[The Department]: But you just said your mom doesn't have a home?

[V.S.]: That was before she got kicked out. She—recently she got arrested for some stuff that had happened and then she gotten [sic] kicked out and now she doesn't have her own home. The second time that I had left [A.U.G.] I had I moved in to—I had learned that my mom didn't have her place and moved in with her across the street from that home, which was [Gallardo's] home. And that only lasted for about two weeks.

On cross-examination, V.S. stated that she was not sure who paid the rent for the house where she was living and believed that either Gallardo or Gallardo's son, Luis, who received disability checks, paid the rent.

Torres, a caseworker with the Department, testified that in June 2009, she was assigned to this case. Torres verified that the Department had been the temporary managing conservator of E.S. and A.G. for more than nine months. Torres stated that the trial court had ordered V.S. and A.U.G. to complete the tasks set out in the family service plan to regain custody of the children. Torres said that the service plan had been explained to V.S. on "numerous occasions" and that V.S. indicated that she understood the service plan.[34] Torres read a portion of the "Family Service Plan Evaluation," which stated that as of May 30, 2009,

> [V.S.] and [A.U.G.] ha[d] not demonstrated any progress in caregiver capability. They continue[d] to miss half of their visitation, have not started any services or been in any contact with the Department. . . . [V.S. and A.U.G.] have not complied with any services for their children. They have shown no attempt to improve the quality of care that they can provide for [E.S. and A.G.].

Torres stated that V.S. had not complied with the trial court's order to complete the tasks in the family service plan, including the parenting classes, the anger management classes, and the psychological evaluation.[35] On cross-examination, Torres explained that the Department's goal is for the parent to complete the services in twelve months, and that V.S. has had twelve months to complete the service plan.

---

[34] On cross-examination, Torres stated, "Initially when I first got the case and I first met with her, and I thoroughly explained everything to her and explained how easy it could be to just participate and attend services just to get her children. I reminded her that they were her children and I did that on numerous occasions. Of course, I wanted to reunify."

[35] On cross-examination, Torres clarified that since November 2009, V.S. had attended six of twelve parenting and anger management classes.

20

Torres stated that V.S. was incorrect when she testified that the psychological evaluation had not been performed because the doctor had not received the paperwork. Torres explained that the doctor had written a letter documenting that two appointments had been made, but that V.S. had missed both appointments.[36]

When asked if the Department made reasonable efforts to assist V.S., Torres replied, "We have—we have arranged services; we have assisted in transportation; we have transported the children; and we have time and time again, especially with [V.S.] explained the services; gone over the service plan; talked to the service providers." Torres stated that because V.S. had missed so many visits with the children, the visits were moved to the Department's office so that the Department could transport the children to and from the visits.[37] According to Torres, V.S. attended thirty out of sixty-four scheduled visits with the children. On cross-examination, Torres stated that because V.S. had missed so many visits, V.S. was required to call and confirm the visits; if V.S. failed to call to confirm the visit, it was cancelled.

Torres testified that V.S. had not demonstrated an ability to provide a safe environment for the children because she has not had a stable home, gained employment, or been able to provide for them financially. Torres believed that V.S. had not demonstrated that she is able to protect the children from A.U.G. because V.S. attempted to protect A.U.G. by lying that E.S. had been in her care when she was

---

[36] The dates of those appointments were October 22, 2009 and December 1, 2009.

[37] Torres stated that the arrangement relieved the foster parents from making unnecessary trips.

injured, "tried to cover up for him when they were about to arrest him," and when V.S. would reunite with A.U.G., she would stop her visitation and services.[38]

Torres testified that it would be in the children's best interest to terminate V.S.'s parental rights. Torres explained:

> [E.S. and A.G.] are still very young. If the children were maybe eight, ten, 12, you know, maybe even five, they'd be verbal. They're not verbal at this point so that, yet, they would be vulnerable to not be able to verbalize if there was any harm being done to them or if they were in any fear. [V.S.] has back and forth or gone time and time again, gone back to [A.U.G.] and has then neglected or avoided to do any services or to visit with the children at the time.
>
> So if there's no guarantee that she wouldn't go back to him and now she's expecting a third child, so yeah—yes, I do believe it would be in the children's best interest that we terminate their rights.

Torres testified that V.S. had not informed her that she was living with a friend, but that she was "made aware" of V.S.'s address when she gave her a ride on the previous day. Torres stated that V.S. told her that she was living with her mother. On re-direct examination, Torres testified that she was not familiar with the people that apparently resided with V.S. and that the Department would not place the children in a home without conducting a home study and criminal background check.

On cross-examination, Torres testified that even if the injuries to E.S. were ruled accidental, she would still recommend termination of V.S.'s parental rights. Torres stated:

> Well, I still feel that she is not able to be protective. She's still even if, you know, it was accidental and she's still tried to—she changed the story and tried to protect him. She did hide him. And she still on occasion continued to go back with him even after the violence and it wasn't just the

---

[38] According to Torres, when V.S. separated from A.U.G., she would start her services and visitation again.

22

black eye, she had bruises all over her arms and so I still feel she wouldn't be protective.

Torres also stated that the Department was concerned that if A.U.G.'s parental rights were terminated without terminating V.S.'s rights, she would return to him and continue to allow the children to see A.U.G. Torres believed that based on V.S.'s past history with A.U.G., V.S. would return to him.

According to Torres, the Department's goal for the children is permanency and for the children to be adopted. Torres stated that when the visits with V.S. are over, the children do not cry. On cross-examination, when asked if in her personal experience, most children the same ages as E.S. and A.G. become very upset when the parent leaves the visitation, Torres responded, "Yes. I'm not going to say all the time, but a lot of the time they do cry and reach out for their mom and dad or their parents."

## IV. DISCUSSION

By her first and second issues, V.S. contends that the evidence is legally and factually insufficient to support the two grounds for termination.[39] By her third issue, V.S. contends that the evidence is legally insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children.

### A. Section 161.001(1)(O)

In this case, the trial court found that V.S. had

failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child[ren] who [have] been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for

---

[39] *See* TEX. FAM. CODE ANN. § 161.001(1)(N), (O).

23

not less than nine months as a result of the child[ren's] removal from the parent under Chapter 262 for the abuse or neglect of the child[ren].[40]

V.S. only challenges that she failed to comply with the provisions of the court's order requiring her to comply with the family service plan. V.S. alleges that "although she initially was not completely compliant with her service plan, for the months leading up to trial she was more than compliant and well on her way to completing them."[41] However, at trial, it was undisputed that V.S. had not complied with the trial court's order that she complete the tasks listed in the family service plan.

The Department developed a family service plan for V.S. to follow in order to regain custody of her children, and the trial court ordered V.S. to comply with that plan. Under the provisions of the plan, V.S. was required to obtain an individual psychological evaluation, which V.S. admitted she had not completed.[42] V.S was required to complete anger management and parenting classes, which she admitted that she had failed to complete. The family service plan required V.S. to attend all of her visitation with her children. However, V.S. stated that she had missed many of her visits with her children, and Torres testified that V.S. had only attended 30 out of 64 scheduled visits with the children. V.S. was ordered to obtain stable and safe housing. However, at trial, V.S. was unable to adequately describe her living arrangements and indicated that she had moved from residence to residence because she did not have any place to go.

---

[40] *See id.* § 161.001(1)(O) (providing that a trial court may terminate a person's parental rights under section 161.001(1)(O), if it finds by clear and convincing evidence that the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child").

[41] We note that V.S. does not challenge the other elements of section 161.001(1)(O) in her brief.

[42] In her brief, V.S. concedes that she did not complete the psychological examination.

Furthermore, the plan required that V.S. not participate in any criminal activity. However, V.S. pleaded guilty to the criminal offense of hindering apprehension after choosing to protect A.U.G. from being arrested for allegedly injuring E.S. Under the terms of the family service plan, either A.U.G., V.S., or both were required to obtain employment. V.S. testified that neither she nor A.U.G. had a job.

Finally, V.S. was required to demonstrate that she was capable of providing a safe and stable home environment for the children. Rombs testified that she did not believe that V.S. had the ability to keep E.S. safe because of the lack of medical care provided to E.S. According to Torres, V.S. had not demonstrated an ability to provide a safe environment for the children because she had not provided a stable home, gained employment, or been able to provide for the children financially. Furthermore, V.S. has repeatedly returned to A.U.G. even though he has abused her and has been indicted for abusing E.S., and V.S. testified that she would request that A.U.G. be granted visitation, although supervised, with the children.

After viewing all of the evidence in the light most favorable to the finding, we conclude that there was legally sufficient evidence for a reasonable trier of fact to form a firm belief or conviction that V.S. failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children.[43] Furthermore, after examining the entire record, we conclude that the evidence was factually sufficient to support the trial court's finding that J.C. violated section 161.001(1)(O) of the family code.[44] We overrule V.S.'s second issue.[45]

---

[43] *See In re J.L.*, 163 S.W.3d at 85.

[44] *See In re M.C.T.*, 250 S.W.3d at 168.

25

**B.    Best Interest**

By her third issue, V.S. generally asserts that there is "no evidence to support the [trial court's] finding that termination of the parent-child relationship" is in the children's best interest.  V.S. argues that she "tried to comply [with the service plan]," she "was attending parenting and anger management classes," and she has a good relationship with her children.

When considering whether parental termination is in the child's best interest, the following non-exhaustive list of factors should be considered:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent.[46]  The party seeking

---

[45] If, as here, the trial court terminated the parent-child relationship on multiple grounds under section 161.001(1), we may affirm on any one ground because, in addition to a finding that termination is in the child's best interest, only one predicate violation under section 161.001(1) is necessary to support the trial court's termination order.  *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."); *In re E.A.K.*, 192 S.W.3d 133, 151 (Tex. App.–Houston [14th Dist.] 2006, pet. denied) ("Because we find that there was legally sufficient evidence to support one of the predicate findings for termination of [A.U.G.'s] parental rights, we need not address the sufficiency of the evidence relating to other predicate findings.").  Therefore, because we have concluded that the evidence is legally and factually sufficient to support the trial court's finding that V.S. violated section 161.001(1)(O), we need not consider V.S's first issue contending that the trial court's finding that she violated section 161.001(1)(N) is legally and factually insufficient.  *See In re A.V.*, 113 S.W.3d at 362; *In re E.A.K.*, 192 S.W.3d at 151; *see also* TEX. FAM. CODE ANN. § 161.001(1)(N),(O).

[46] *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

26

parental termination is not required to prove all nine factors.[47] Furthermore, when the Department or another government agency is the petitioner, subsection 263.307(a) of the family code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."[48] Subsection (b) then lists thirteen factors the court, the department, or other authorized agencies should consider in determining whether a parent is "willing and able to provide the child with a safe environment."[49] In our review of the trial court's termination order, we will likewise

---

[47] *See In re C.H.*, 89 S.W.3d at 27 (providing that these considerations are not exhaustive "or that *all* such considerations must be proved as a condition precedent to parental termination") (emphasis in original); *In re J.R.S.*, 232 S.W.3d 278, 284 (Tex. App.–Fort Worth 2007, no pet.) ("These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.").

[48] TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2008).

[49] *Id.* § 263.307(b). Those factors enumerated in section 263.307(b) include, among others, the following:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

. . . .

(6) the results of psychiatric, psychological, or developmental evaluations of the child, parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

. . . .

(10) the willingness and ability of the child's family to seek out and accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time. . . .

27

give consideration to these factors to the extent applicable.[50]

Although there is a strong presumption that it is in the child's best interest to allow the natural parent to retain custody, when confronted with evidence to the contrary, that presumption disappears.[51] Evidence proving one or more of the statutory grounds for termination may be probative in determining that termination is in the best interest of the child.[52] A best-interest analysis may be based on direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence as a whole.[53] "A parent's unstable lifestyle, lack of income, and lack of a home may also be considered in a determination of a parent's ability to provide for a child's emotional and physical needs and may also threaten the physical well being of the child."[54]

Here, A.G. was too young to express her desire about the matter, and E.S. had limited communication abilities due to a speech impediment. However, the children's foster father testified that although E.S. had the ability to communicate verbally "to get her thoughts across," she had never asked to see V.S. and had never indicated that she missed V.S. He also stated that although he and his wife encouraged their foster children to address them by their first names; E.S. called his wife "Mommy." Finally,

---

*Id.*

[50] *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re S.N.*, 272 S.W.3d 45, 50-51 (Tex. App.–Waco 2008, no pet.); *In re T.N.F.*, 205 S.W.3d 625, 632-33 n.3 (Tex. App.–Waco 2006, pet. denied).

[51] *In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.–San Antonio 2003, no pet.).

[52] *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.–Houston [1st Dist.] 2008, pet. denied).

[53] *In re T.N.*, 180 S.W.3d 376, 384 (Tex. App.–Amarillo 2005, no pet.) (citing *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.–Fort Worth 2003, no pet.)).

[54] *Id.*

28

Torres testified that although most children cry when a visitation with a parent ends, neither E.S. nor A.G. cried when visitation with V.S. ended.

V.S. started living with A.U.G. when E.S. was six or seven months old. When E.S. was thirteen months old, V.S. moved out of A.U.G.'s home because V.S. claimed that abused her. V.S. admitted that when she left A.U.G.'s home, she left E.S. with A.U.G., even though she was afraid to be at A.U.G.'s home alone and she knew that A.U.G. was "still on drugs." V.S. stayed with her mother; however, V.S. did not explain why she could not take E.S. with her. V.S. acknowledged that before she left E.S. alone with A.U.G., he had not provided any care for E.S. V.S. did not see E.S. while E.S. lived with A.U.G. until the night that E.S. was injured—approximately two weeks later.

Dr. Harper was concerned about how E.S. had been injured and opined that the burns were consistent with a person immersing E.S.'s head into water. Dr. Harper stated that the burn going all the way from the face up into the entire scalp and hairline meant that E.S.'s "head would have to [have been] fully immersed in hot water. . . . It looks as though her head and face were just dipped into scalding hot water." Dr. Harper agreed that based on reasonable medical certainty, E.S.'s injuries were non-accidental. Therefore, the explanation V.S. and A.U.G. gave the hospital and the Department is not consistent with the injuries sustained by E.S.

After E.S. and A.G. were removed, V.S. moved back to A.U.G.'s home despite the fact that he had abused her and it was suspected that he had caused the injuries to E.S. According to V.S., A.U.G. continued abusing her when she returned to his home, including an incident when A.U.G. punched V.S. in the face for no apparent reason. V.S. admitted that while living with A.U.G., she committed the crime of hindering

29

apprehension by lying to the police to protect A.U.G. from being arrested for allegedly causing the injury to E.S. V.S. lived with A.U.G. "during the pendency of this case" until November 2009. At the time of the trial, V.S. was four months pregnant with her third child with A.U.G.

Torres testified that V.S. has not demonstrated an ability to provide a safe environment for E.S. and A.G. because V.S. has not acquired her own stable home, she has not been able to provide for them financially, and she does not have a job. According to Torres, V.S. is not able to protect the children from A.U.G. because of her history of lying to protect him and because when she lived with him, she would stop her visitations with the children and her services with the Department. Torres stated:

> [V.S.] would be doing her services, attending visitation, and then she would stop. And when we would come back I would meet with her to reinstate, it would be that she had gotten back with him.
>
> . . . .
>
> When she's away from [A.U.G.] she is cooperative with the Department and with me. She does participate, but it's when she goes back and that's what my concern [sic], that she continues to go back [to A.U.G.]
>
> . . . .
>
> Based on her history, based on her lying in the beginning, her hiding him, and her going back to him a number of times, I think that even if the Department were to, you know, reunify with her and terminated on the dad, there would be some chance of her still allowing—or going back to him. . . . The Department is concerned about the well-being of the children and that's why we're asking for termination.

Torres said that that based on V.S.'s past history of leaving A.U.G. and then returning to him repeatedly, she believed V.S. would return to A.U.G. in the future "because it seems to be a pattern."[55]

According to Torres, termination of V.S.'s parental rights is in the best interest of the children. Dr. Harper testified that she has concerns about E.S. returning to the home where she received the injuries because being burned so severely is "a fairly lethal way to injure a child because a lot of these kids don't survive the shock [and] whoever caused these injuries is a real risk to her." Although V.S. stated, "I know I can protect [the children]," she admitted that she had done "nothing" to show the trial court that she had that ability.

Even after approximately twelve months, V.S. had not completed the requirements of the family service plan including the parenting classes. Torres testified that V.S. had twelve months to complete twelve classes, but she had not done so. From the evidence presented, the trial court may have determined that V.S. had poor parenting skills and had not been motivated to learn how to improve her skills. Also, Torres testified, and V.S. admitted, that she had not completed her psychological evaluation.

V.S. testified that if the children were returned to her, she would get a job and return to school to acquire her GED. V.S. stated that although she was living with a friend, she was on a list to acquire housing of her own. However, V.S. explained that it could take approximately twelve to eighteen months for her to actually get an apartment. V.S. did not state where she intended to live with the children in the

---

[55] *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.–Fort Worth 2009, no pet.) (op. on reh'g) (explaining that a trier of fact may rely on past conduct to infer that similar conduct will occur in the future).

meantime. The Department planned for the children to be placed for adoption. The children were residing with foster parents who had ten years' experience. The foster father testified that the children were adoptable and that he knew of a family that was interested in adopting them.

The evidence showed that V.S. had not been employed for the past year that her children were in the Department's custody. For the majority of the previous year, V.S. lived with A.U.G., who had been arrested for causing E.S.'s injuries. And, V.S. stated that while living with A.U.G., he abused her. V.S. finally left A.U.G. and moved in with a friend two months before the trial. According to V.S., she did not have any other place to go. V.S. testified that she has left A.U.G. in the past; however, for unexplained reasons, she has gone back to him on numerous occasions. Therefore, the trial court may have concluded that V.S. is unable to provide for the children's emotional and physical needs because she has not secured a stable home in which they could live.

Examining all of the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have reasonably formed a firm belief or conviction that terminating V.S. parental rights was in the best interest of E.S. and A.G.[56] Accordingly, we overrule V.S.'s third issue.

## V. CONCLUSION

We affirm the trial court's judgment.

Linda Reyna Yañez
JUSTICE

Delivered and filed the
21st day of December, 2010.

---

[56] *See In re J.L.*, 163 S.W.3d at 85.